

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00044-CV

_____

IN THE MATTER OF M.N.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-105773-17

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

In October 2017, the juvenile court adjudicated appellant M.N. delinquent upon finding that she had committed the offense of assault causing bodily injury. *See* Tex. Family Code Ann. § 54.03(f); Tex. Penal Code Ann. § 22.01(a)(1). The juvenile court placed her on home probation for one year. *See* Tex. Fam. Code Ann. § 54.04(d)(1). In January 2018, the State moved to modify M.N.'s disposition, alleging that she had violated the terms of her probation by running away from or leaving her home without permission. *See* Tex. Fam. Code Ann. § 54.05(a), (d). The juvenile court granted the motion and modified the disposition, placing M.N. on probation outside of her home.

In a single issue, M.N. argues the juvenile court abused its discretion by modifying her disposition. Concluding otherwise, we affirm.

## I. APPLICABLE LAW

Section 54.05(m) of the family code governs the issues M.N. raises in this appeal. *See id.* § 54.05(m). The text of that section provides that if in a modification proceeding a juvenile court modifies the disposition by placing the child on probation outside of the home, it shall include in the modification order findings that (1) it is in the child's best interests to be placed outside the child's home, (2) reasonable efforts were made to prevent or eliminate the need for the child's removal from the child's home and to make it possible for the child to return home, and (3) the child, in the child's home, cannot be provided the quality of care and level of support and

2

supervision that the child needs to meet the conditions of probation. *Id.* § 54.05(m)(1); *In re J.I.T.*, No. 04-12-00836-CV, 2013 WL 3486827, at *1 (Tex. App.—San Antonio July 10, 2013, no pet.) (mem. op.). The juvenile court made those findings here.

## II. STANDARD OF REVIEW

Juvenile courts are vested with a great amount of discretion in determining the suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct, especially in proceedings to modify an earlier disposition. *In re D.R.A.*, 47 S.W.3d 813, 815 (Tex. App.—Fort Worth 2001, no pet.). We thus review a juvenile court's decision to modify a juvenile disposition for an abuse of discretion. *See In re J.P.*, 136 S.W.3d 629, 632 (Tex. 2004); *In re M.O.*, 451 S.W.3d 910, 914 (Tex. App.—El Paso 2014, no pet.). A juvenile court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *In re J.Y.*, No. 02-17-00092-CV, 2017 WL 3298301, at *2 (Tex. App.—Fort Worth Aug. 3, 2017, no pet.) (mem. op.).

## III. DISCUSSION

M.N. argues that the juvenile court abused its discretion because none of its section-54.05(m)(1) findings is supported by sufficient evidence. In appropriate cases, legal and factual sufficiency are relevant factors in assessing whether the juvenile court abused its discretion. *Id.* In the context of this appeal—one involving an appeal from a juvenile court's modification of disposition—we apply the familiar civil standards of

3

review when evaluating the sufficiency of the evidence. *See id.* As we discuss below, we conclude the record contains evidence that is legally and factually sufficient to support each of the juvenile court's section-54.05(m)(1) findings.

## A. THE EVIDENCE

### 1. Social History

The juvenile court admitted a social-history report that M.N.'s probation officer, Ursula Thomas, completed on January 30, 2018. That report revealed that M.N. had an extensive history with the juvenile department.[1] In December 2013, she was referred for making a terroristic threat, for which she received deferred-prosecution probation. In April 2015, she was referred for assault causing bodily injury. She received deferred-prosecution probation for that offense as well but was ultimately adjudicated delinquent in April 2016 and placed on probation. In October 2015, M.N. was again referred for two assaults causing bodily injury, the victims being her mother and her sister. The district attorney's office nonsuited those cases.

In May 2016, M.N. was referred for another assault, a case the district attorney's office dismissed. However, she remained on probation for her April 2016 adjudication. In July 2016, M.N. was referred for running away, a violation of her probation. She received a supervisory caution for that probation violation. In

---

[1]During the hearing, the juvenile court reviewed this history with M.N., and she acknowledged it was accurate.

December 2016, M.N. was again referred for assaulting her mother and received another supervisory caution. In April 2017, she was referred for running away, which the district attorney's office dismissed.

In July 2017, M.N. was again referred for assaulting her mother and sister. This referral is the basis of the October 2017 adjudication and subsequently modified disposition that forms the basis of this appeal. In October 2017, M.N. twice violated her electronic monitoring. And she again violated her electronic monitoring in November 2017 and December 2017.

The social history also contained a family history. It reflected that although M.N.'s father lived in Tarrant County, he had sporadic contact with M.N. and was reportedly disabled. He did, however, pay child support. The report also noted that M.N.'s father had stated that there had been domestic violence between him and M.N.'s mother during their relationship and that he had had a difficult time co-parenting with M.N.'s mother.

According to the family history, M.N.'s mother, S.B., was unemployed. In March 2000, she had received deferred adjudication for a charge of aggravated assault with a deadly weapon. And in September 2011, she was convicted of assaulting a public servant and sentenced to three years' imprisonment. The report also reflected that S.B. was facing serious health issues. Specifically, in September 2017, she had been diagnosed with stage III lymphoma. As a result, she was undergoing intense medical treatment that included chemotherapy on Mondays, Tuesdays, and

Wednesdays, as well as numerous other medical appointments throughout the week and frequent hospitalizations. The report indicated that S.B.'s cancer had recently spread to her liver.

The family history further noted that M.N. had a sister, M.B., who also lived with M.N. and S.B. M.B. had also been diagnosed with stage III cancer in September 2017 and was undergoing intense medical treatment as a result. Her treatment included chemotherapy on Fridays that necessitated overnight hospitalization at Cook Children's Hospital. M.B. also had a history of involvement with the juvenile department: in March 2015, she was referred for assaulting M.N.; in December 2015, she was referred for assaulting S.B.; and in September 2016, she was referred again for assaulting S.B. Those referrals resulted either in deferred-prosecution probation or in a supervisory caution.

The social history noted that M.N., M.B., and S.B. had a history of assaulting one another, though it added that since M.B.'s and S.B.'s September 2017 cancer diagnoses, there had been no reports of physical altercations. S.B. noted, however, that M.N. stressed her out by being disrespectful and argumentative at home. S.B. also stated that she sometimes did not take her pain medication so that she could watch M.N. to make sure she did not run away. In addition, to keep M.N. from running away, S.B. had also resorted to taking M.N. with her everywhere she went, including to her doctor visits and her hospital stays.

The report also reflected that M.N. had been diagnosed with ADHD in the past and had received inpatient services. S.B. stated that the last time M.N. had taken her medications was four months prior (i.e., approximately September 2017). S.B. further stated that M.N. had missed her last two or three appointments to be assessed for a determination whether she should go back on her medication. According to S.B., the reason M.N. had missed those appointments was because she was either in detention or had run away. The report noted that M.N. had been seen by a doctor on January 11, 2018, while in detention and that she had been prescribed Lexapro.

The social history also outlined the services the juvenile department had provided. Those services included electronic monitoring from August to November 2017. The report noted M.N. did not successfully complete that service, stating that she had curfew violations, had run away from home, had cut off her electronic-monitoring bracelet, and had gone to Dallas to be with her boyfriend. The report further stated that the juvenile department had referred M.N. for a family-counseling program in October 2017. That service could not start at that time, however, because M.N. had run away. When the juvenile department contacted S.B. in December 2017 to discuss starting the family in counseling, S.B. stated that she was in the hospital and did not have time to complete the assessment or to participate in the program. When the juvenile department contacted S.B. again on January 5, 2018, to discuss starting the family-counseling service, S.B. stated that she did not believe they would have time to participate in the program due to her frequent medical appointments.

7

In addition to electronic monitoring and the family-counseling referral, the report noted additional services the juvenile department had provided M.N. dating back to December 2013. M.N. had successfully completed some of those services, but not others.

The social-history report also included a psychological evaluation of M.N. that had been conducted in August 2017. That report indicated that S.B. had informed the psychologist that she was most concerned about M.N.'s running away from home to meet males with whom she had connected on Facebook. S.B. stated that she had tried to discipline M.N., including revoking her phone privileges, barring her from watching television, and restricting her from going outside of the house. S.B. stated that in an effort to keep M.N. from running away to meet people from Facebook, she had even shown M.N. information about children who had been killed as a result of meeting people on Facebook.

The report also included a summary and recommendation from Thomas. She noted that M.N. had been banned from spending the night at Cook Children's when her sister would stay overnight because M.N. routinely walked through the halls unaccompanied, despite warnings not to do so. Further, Thomas noted that M.N. was very promiscuous and had a different boyfriend "almost every week" that she usually had met through social media. Thomas noted that M.N. would run away from home to be with those boys or young men, most of whom were total strangers, and would stay gone for days. Thomas also reported that whenever M.N. was in

detention, she would put her mother's and sister's medical conditions as a priority as a way of getting released.

Thomas also reported that whenever M.N. was at home, S.B. would complain that the juvenile department was not doing anything to help her and that M.N. was stressing her out, and S.B. would demand that M.N. be placed elsewhere. But when M.N. was in detention, S.B. would "cool[] off" and want M.N. back at home. According to Thomas, when M.N. was back at home, "the cycle [would] start[] again." Thomas concluded the following: "Due to [M.N.'s] continued non-compliance while on probation and the seriousness of the medical conditions of her mother and sister, it is believed that at this time, a stricter environment would be more suitable for [M.N.] so that [S.B.] can put her health as a priority."

### 2. Placement Summary

The juvenile court also admitted a placement summary that the juvenile department's placement supervisor, Debbie Spoonts, had completed. She stated that the department's resource staffing committee had approved M.N. for placement consideration based upon her failure to comply with her home probation and ongoing conflict at home. Spoonts reported that M.N. had been accepted for placement at a youth center in Amarillo based on her history of noncompliance, aggression, and running away from home.

According to Spoonts, the program in Amarillo was a secure program that involved a phase system in which clients moved through the phases by displaying

9

positive behaviors, participating in therapy, and completing their treatment paperwork. Clients earned more privileges as they progressed through the phases. The program provided individual counseling twice per month, group counseling depending on the client's needs, and family therapy. The program also provided trauma-focused groups if appropriate. Finally, the program had an on-campus school to meet the clients' educational needs. Spoonts further added that the Amarillo program's distance from M.N.'s home was a concern given her mother's and sister's serious health conditions.

### 3. Testimony

### S.B.

S.B. testified at the hearing. She stated that she wanted M.N.'s probation to be extended and for M.N. to be allowed to come home because S.B.'s medical condition was worsening. If M.N. was placed in Amarillo, S.B. was concerned that M.N. would be too far away to return home if S.B.'s health seriously deteriorated. S.B. stated that she had a long-term plan for M.N. in the event of a worst-case scenario: her mother and brother would take both of her children. S.B. stated that in the time since M.N. had been placed back in detention,[2] she felt that M.N. had been better and had disclosed "some of the things that she was going through" that had caused her to

---

[2]The record contains a directive to apprehend M.N. the juvenile court issued on January 3, 2018, and it shows that M.N. was placed in the custody of the juvenile department on January 5, 2018. The juvenile court held the modification hearing on February 1, 2018.

10

misbehave. S.B. further stated that she believed one of M.N.'s problems was that M.N. needed to be on medication and that M.N. needed to be out of detention so she could get an appointment to obtain medication. S.B. stated that whenever M.B. had to stay overnight at Cook Children's, M.N. could stay with S.B.'s mother or brother, since M.N. was not allowed to stay overnight at Cook Children's.

S.B. testified that whenever M.N. ran away, she was only gone for about twenty-four hours. She also testified that it was not possible for M.N. to stay with another family member because S.B.'s mother and brother did not drive, and thus M.N. would not be able to get back and forth to school. And she also testified that it was not possible for M.N. to participate in family counseling due to the frequency of S.B.'s and M.B.'s medical appointments.

## M.N.

M.N. also testified at the hearing. She testified that she had thought about things since she had been in detention and realized that when she runs away from home, something serious could happen to S.B. or M.B. She stated that if the juvenile court let her go home, she realized it was best for her to stay there, and she stated, "[T]hat's my commitment. I'm going to stay at home with my mom and sister." M.N. also stated that she understood there could be absolutely no physical fighting with her mother or sister, especially given the fragile states of their health. M.N. stated she was "just ask[ing] to be sent home so [she] can spend more time with [her] mama and just discuss things with her."

11

## Thomas

Thomas also testified. She stated that M.N.'s running away from home was not a new development but had been an ongoing issue throughout M.N.'s involvement with the juvenile department. Thomas stated that while M.N. had not started her most recent referral for family counseling, she had completed family counseling in the past, in addition to participating in other programs through the juvenile department. Thomas stated that the probation department believed it was best for M.N. not to remain at home because she stressed her mother out by arguing and being disrespectful and caused her mother to not take her medication so that she could try to make sure M.N. did not run away. Thomas also contradicted S.B.'s testimony that M.N. would only run away for twenty-four hours. Thomas noted that M.N. was gone for three to four days the last time she had ran away.

Thomas stated that since October 2017, her interaction with M.N. due to incidents of running away had been minimal because M.N. was on home probation and electronic monitoring. But she confirmed that M.N. had electronic-monitoring violations. And Thomas confirmed that it was not M.N.'s fault that she was unable to participate in the family-counseling services that she had been referred to in October 2017.

## Spoonts

Spoonts testified as well. She confirmed that she had found a placement for M.N. in Amarillo and stated that it offered individual counseling twice per month for

clients in the program. She added that given M.N.'s history, she believed M.N. would be put in a trauma-focused group and that clients in that group sometimes received individual counseling more frequently than twice per month. Spoonts also stated that the Amarillo program provided family counseling but only in certain phases. Spoonts said that the Amarillo facility could not provide transportation, and thus, if M.N.'s family could not obtain their own transportation to Amarillo, it would be difficult for them to get back and forth for family counseling. But Spoonts added that in that case, "phone participation, phone family therapy" could be provided.

Spoonts also stated that although she did not discuss with the Amarillo facility a contingency plan for M.N. if S.B.'s health deteriorated significantly, if something major were to happen, then the juvenile department would try to get M.N. back home. But Spoonts reiterated that given M.N.'s behavioral and mental-health issues, the Amarillo facility was the most appropriate one for her.

## B. ANALYSIS

With respect to the juvenile court's section-54.05(m)(1)(A) finding, M.N. contends that placing her outside of the home would have been in her best interest if the placement involved regular intensive counseling. M.N. contends the evidence shows that the Amarillo facility only provided two sessions of individual counseling per month and that family counseling was not an option given how far away the facility was from M.N.'s family. According to M.N., that was not a sufficient amount

13

of counseling to support a finding that an out-of-home placement was in her best interest.

Even if the juvenile court's section-54.05(m)(1)(A) finding in this case turns *solely* on what counseling services the Amarillo facility could provide M.N. (which we do not hold), M.N. is incorrect about what the evidence supports in that regard. First, Spoonts testified that while the Amarillo facility generally provided two individual counseling sessions per month, it sometimes offered more individual counseling to clients who were placed in the trauma group, and Spoonts further stated that M.N. likely would be placed in that group given her history. Spoonts additionally testified that the Amarillo facility offered family counseling and that if M.N.'s family could not travel to Amarillo to participate in person, then "phone participation, phone family therapy" could be provided. Thus, in light of Spoonts's testimony, as well as her placement summary, the juvenile court could have reasonably found that, contrary to M.N.'s assertion, M.N. would receive more than two sessions of individual counseling per month and would be able to participate in family counseling if she were to be placed at the Amarillo facility.

But more importantly, the juvenile court could have reasonably concluded that placing M.N. outside of the home was in her best interest because her placement in the home jeopardized her physical safety. That is so because from the evidence we have summarized, the juvenile court could have reasonably believed that M.N. routinely ran away from home to meet and stay with boys and young men she had

14

met on social media, many of whom were complete strangers to her. S.B. herself believed this behavior was dangerous to M.N.'s safety, as demonstrated by the fact that in an effort to discourage that behavior, she had shown M.N. information about children who had been killed as a result of their interaction with individuals they had met via social media. The juvenile court could have reasonably shared S.B.'s belief that M.N.'s behavior was dangerous to M.N.'s physical safety. And the juvenile court could also have reasonably believed that, given M.N.'s pattern of failing to respond to either her mother's or the juvenile department's best efforts to discourage that behavior, placing M.N. in a secure facility like the one in Amarillo was in her best interest.

Turning to the juvenile court's section-54.05(m)(1)(B) finding, from the evidence summarized above, the juvenile court could have reasonably concluded that the juvenile department had made reasonable efforts to prevent or eliminate the need for M.N. to be placed outside the home. First, the juvenile court could have reasonably concluded not only that S.B.'s medical condition was a significant reason why she was unable to provide the level of supervision necessary to keep M.N. from running away, but also that it was a significant reason why M.N. was unable to participate in the family-counseling services to which the juvenile department had referred her in October 2017. And the juvenile court could have reasonably concluded that no service from the juvenile department would have been able to substantially mitigate the effects of S.B.'s serious medical condition on M.N.

15

Further, the evidence shows that the juvenile department provided M.N. with services over an extended period of time to no avail. The evidence showed that M.N. had unsuccessfully completed electronic monitoring provided from August to November 2017; had been referred for, and participated in (though unsuccessfully), functional-family therapy from September to October 2016; had successfully completed intensive-supervision probation from September to November 2016; had successfully completed electronic monitoring in May 2016; had unsuccessfully completed a mentoring program from May to July 2016; had successfully completed a previous round of family counseling; and had successfully completed a families-in-transition program from March to May 2014. And in the current case, the juvenile department placed M.N. on electronic monitoring after she received home probation in October 2017, but that did not prevent her from flouting the terms of her home probation: M.N. violated her electronic monitoring at the end of October 2017 by cutting off the monitoring device and running away to Dallas, and she twice violated her electronic monitoring the following November and December.

We conclude the juvenile court could have determined from the services we have described—which are extensive—that reasonable efforts were made to eliminate the need to remove M.N. from the home.

That leads us to the juvenile court's section-54.05(m)(1)(C) finding. Much of the evidence we have already discussed in relation to the juvenile court's other two findings is also relevant to this final finding. In short, as we have noted, the evidence

16

supports a finding that because of S.B.'s serious medical condition, she was unable to supervise M.N. in such a way as to prevent her from running away from home. Further, based on the evidence showing a pattern of assaults among M.N., S.B., and M.B., the evidence also supports a conclusion that M.N. cannot find in her home the level of stability necessary to receive the quality of care and level of support and supervision she needs to meet her probation conditions.

In sum, viewing the evidence through the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the juvenile court's section-54.05(m)(1) findings. Accordingly, the juvenile court did not abuse its discretion by modifying M.N.'s probation. We overrule M.N.'s sole issue.[3]

## IV. CONCLUSION

Having overruled M.N.'s sole issue, we affirm the juvenile court's judgment. *See* Tex. R. App. P. 43.2(a).

---

[3]M.N. also asserts that the juvenile court's probation modification was arbitrary and without reference to any guiding rules of principles because it resulted in a disposition that was disproportionate to her underlying probation violation of running away. But M.N. did not raise this argument in the juvenile court, so it is not preserved for review. *See* Tex. R. App. P. 33.1(a); *see also Noland v. State*, 264 S.W.3d 144, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("[I]n order to preserve for appellate review a complaint that a sentence is grossly disproportionate, … a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired.").

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  April 18, 2019